UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

R. Fredrick Rouse,

    Plaintiff,

v.                                             Civ. No. 04-1090 (JNE/RLE)
                                                 ORDER

UNUM Life Insurance Company
of America,

    Defendant.

Paul W. Wojciak, Esq., Johnson, Killen & Seiler, appeared for Plaintiff R. Fredrick Rouse.

John Harper III, Esq., Krass Monroe, PA, appeared for Defendant UNUM Life Insurance Company of America.

      R. Fredrick Rouse brought this action against UNUM Life Insurance Company of America (UNUM) to recover long-term disability (LTD) benefits under a plan offered by his employer, Duluth Paper & Specialties Company (Duluth Paper), pursuant to the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001-1461 (2000). The case is before the Court on cross-motions for summary judgment and on UNUM's motion to strike. For the reasons set forth below, the Court denies UNUM's motion to strike and both motions for summary judgment.

## I.    BACKGROUND

      Rouse is the president, chief executive officer (CEO), and sole owner of Duluth Paper, a wholesale product distributor located in Duluth, Minnesota. Duluth Paper distributes paper and related products to about 2,000 customers and employs approximately fifteen people. Rouse has worked for Duluth Paper in different capacities since 1977; he became president and CEO in 1990. The record does not reveal when he became sole owner.

1

At all times relevant to this litigation, Rouse was an insured under UNUM Group Long Term Disability Policy No. 340339.  The Policy provides:

> We will pay you a monthly benefit after the end of the elimination period when we receive proof that you:
>
> 1. are disabled due to sickness or injury; and
>
> 2. require the regular attendance of a physician.

The Policy further provides that:

> Disability benefits will cease on the earliest of:
>
> 1. the date you are no longer disabled;
>
> 2. the date you die;
>
> 3. the end of the maximum benefit period;
>
> 4. the date your current earnings exceed 80% of your indexed pre-disability earnings.

The Policy defines "disability" and "disabled" as follows:

> "Disability" and "disabled" mean that because of injury or sickness:
>
> 1. you cannot perform each of the material duties of your regular occupation; or
>
> 2. you, while unable to perform all of the material duties of your regular occupation on a full-time basis, are:
>
>     a. performing at least one of the material duties of your regular occupation or another occupation on a part-time or full-time basis; and
>
>     b. earning currently at least 20% less per month than your indexed pre-disability earnings due to that same sickness or injury.

On January 16, 2002, Rouse underwent surgery to correct a footdrop problem that caused him severe back pain.  An infection contracted shortly after the surgery required Rouse to take

intravenous antibiotics and delayed his recovery and return to work. He returned to work part-time on March 11, 2002.

At the end of May 2002, when he was working from twenty to thirty hours per week, Rouse submitted an application to UNUM for long-term disability benefits. He claimed that back cramps and numbness in his right leg prevented him from performing the material duties of his job as president and CEO of Duluth Paper. In connection with his application for benefits, Rouse submitted the Attending Physician Statement of Robin W. Hendricks, M.D., who imposed restrictions of "no lifting, brace wear when ambulating then as tolerates." Rouse also provided, at UNUM's request, multiple descriptions of his duties at the time of his disability. On August 7, 2002, for instance, he described his duties as follows:

> A normal work week would start at 6:30-6:45 AM and end any where from 5:30-7:30 PM. I normally would put in between 60-70 hours per week. Time would be allocated as follows:
>
> 5-7 hours    Reviewing previous days orders and back orders for any shortages or filling errors that need to be corrected before the days deliveries can be made. This requires walking up and down the warehouse to check inventory and product already staged for delivery.
>
> 6-10 hours   Helping to load trucks, pull back orders to be filled and checking order fill accuracy before the order is loaded on our truck for delivery.
>
> 8-10 hours   Meeting with our salespeople answering questions and reviewing the call and route schedules each week.
>
> 1-2 hours    Meeting with manufacturer and mill representatives that come and do sales training for their respective lines.
>
> 6 hours    Reviewing account receivable print out of our 2000 active accounts with Jim Johnson. We then decide on course of action, who should call or if a personal visit by me is required.
>
> 16-20 hours    Making sales calls/equipment/product demonstrations with our 5 salespeople and or with manufacture reps that come in from out of town. We do product demos, stripping and waxing floors, and demo application of any

of our other chemical products. These sales calls require the carrying of product and supplies into the account, across parking lots and up and down stairs.

      6-8 hours     Demonstrating floor care equipment. This requires loading floor machines into a pickup truck or trailer that weight from 45# to 1200#. They then need to be transported to the customer's site unloaded and demo to show how it will work for them, and then reloaded and returned to our warehouse.

      6-8 hours     Doing service/repair work if our repair person needs help or is out of the area and the customer needs immediate service if their machine is broken down.

      12-15 hours     Ordering product, general management responsibilities, personnel issues, and general office/customer service overview and supervision.

As part of UNUM's review of Rouse's claim for benefits in August 2002, Thomas Waymire, a vocational specialist, reviewed Rouse's submissions. Waymire's report states that prior to becoming disabled, Rouse reported working "up to 50 hours per week or more" and used that time as follows:

> about 40% of his time performing CEO/President duties per week; about 30% of his time performing warehouse supervisor duties per week; and about 30% of his time per week doing outside sales calls, making sales calls with staff, performing equipment sales and service, etc.

Waymire also wrote:

> Based upon most companies a CEO/President would not function in the 30% category of Warehouse Supervisor and be involved in the heavier aspects of loading or unloading product. However, Mr. Rouse does indicate that in his business he does these duties and he considers these duties material to his work and they account for about 30% of his time per week. Given the size of his company this may not be unreasonable.

On October 11, 2002, UNUM approved Rouse's application for benefits. UNUM initially determined that Rouse was entitled to monthly benefits of $2,502.50. On January 22, 2003, UNUM determined that Rouse was entitled to $5,000.00 per month, the maximum amount payable under the Policy.

4

Rouse saw Dr. Hendricks again on January 16, 2003. Noting that Rouse was "quite stable," Dr. Hendricks released Rouse to lift up to fifty pounds. Shortly thereafter, on February 4, 2003, Rouse submitted to UNUM a supplemental statement in which he stated that his right ankle was weak and that he could not walk on uneven terrain without falling. He also stated that he found sitting for long periods difficult and driving uncomfortable.

On January 22, 2003, Janice Ward, the UNUM Customer Care Specialist assigned to Rouse's case, asked Waymire to conduct another job analysis to determine what the material duties of Rouse's occupation were. Waymire, in turn, asked Genex Vocational Rehabilitation Company (Genex) to conduct an on-site vocational evaluation. Joanna Page, a representative of Genex, met with Rouse on March 4, 2003, at Duluth Paper. In a report of her findings, Page noted that on the date of their meeting Rouse was dressed in slacks, a button-up shirt, and a tie and that "it seems he spends most of his time in his office." Rouse informed Page during the meeting that, as a result of his disability, he was required to contract out some trucking duties, pay his warehouse workers overtime, and enlist the assistance of his children to load and unload trucks and make deliveries. He reported that he was unable to hire another full-time warehouse worker to perform the warehouse duties he had performed before his injury because it would be prohibitively expensive to do so. He indicated that, at that time, he was working approximately forty hours per week.

After receiving and reviewing Page's report, Waymire concluded:

> In defining Mr. Rouse's occupation as Owner/President of a small paper products distributing company it would appear that with physical capabilities of occasionally being able to lift 50 lbs as his only limitation, that he could perform the duties of his occupation. Clearly, his material and substantial duties are to supervise and manage workers who perform sales and delivery functions and to manage the financial aspects of the company. It would appear that based upon current medical information including his current restrictions and limitations he

could perform his occupation. As manager he can delegate and supervis[e] others to perform any duties that he physically would feel unable to perform.

UNUM subsequently determined that Rouse was not disabled within the meaning of the Policy and discontinued benefits effective April 3, 2003. By letter of March 31, 2003, UNUM informed Rouse of its decision, reasoning that with Rouse's physical capabilities of occasionally being able to lift fifty pounds, he could perform the material duties of his regular occupation. UNUM concluded that Rouse's material duties were managing the financial aspects of the company and supervising and managing workers who perform sales and delivery functions.

Rouse appealed UNUM's decision on April 22, 2003. In support of his appeal, he submitted a letter from Dr. Hendricks dated April 11, 2003. In that letter, Dr. Hendricks placed the following permanent restrictions upon Rouse:

> A 20-pound weight limitation lifting floor to bench, 10-pound lifting restriction from an overhead location, carrying no more than 10 pounds 25 to 50 foot distances over uneven surfaces. In terms of stairs and ladders, I think it is reasonable if he is not carrying anything. He should limit his pushing and pulling to as tolerates. I do not recommend pushing and pulling heavy loads on the hand cart if there is a lot of resistance with the carts rolling abilities. He should also limit his twisting, bending, squatting, and stooping to as tolerates. He does not have any long-term sitting or driving restrictions.

After receiving Rouse's appeal and Dr. Hendricks' April 11, 2002, report, UNUM conducted two in-house medical reviews. David Frank reviewed Rouse's case on June 20, 2003. He concluded:

> It is reasonable that the claimant would have ongoing restrictions and limitations with recognition of the ongoing ankle weakness that is necessitating the use of a leg brace . . . The restrictions provided by Dr. Hendricks generally appear reasonable. The information provided does not present a clear clinical assessment, diagnostic or functional testing basis for understanding the shift in the recommended strength level of 50 pounds on 01-16-03 down to the maximum strength level of 20 pounds as presented in the letter of 04-11-03.

Joseph R. Thomas, M.D., reached a similar conclusion on June 30, 2003. Dr. Thomas wrote:

> There is no objective information to support the restrictions given to the attorney in the April letter. That is not to say that some restrictions would be appropriate with the history and surgical treatment noted in the file. Claimant should be able to lift at least 20 pounds, likely more on an occasional basis. Bending and twisting at the waist would be restricted to occasionally. Claimant would likely not be able to load and unload trucks, but would have no restriction on walking and supervising in the warehouse. Genex referral notes that claimant is usually based in his office and goes to the warehouse as he desires.
>
> It does appear that claimant is capable of running his business and supervising in the warehouse. He has no restrictions on sitting or driving, but may not be able to load and unload a truck, something that the president of a business would not normally perform.

In addition to conducting medical reviews after Rouse's appeal, UNUM solicited financial information from Rouse in an effort to ascertain whether he was earning at least twenty percent less per month than his indexed pre-disability earnings due to his reported disability. Rouse complied. Taking into account the information Rouse submitted, Mark Mathys, a CPA, concluded that Duluth Paper's loss of gross profit and increase in operating expenses were the root causes of Rouse's decline in earnings, and that "[o]nly $9,056.89 represents the increase in delivery charges which is 7% of the total decrease in earnings."

On September 25, 2003, UNUM affirmed its benefits determination. UNUM reasoned that Rouse was performing all of the material duties of his occupation and that, in any event, only 7% of his loss in earnings was attributable to his disability. By letter of January 21, 2004, Rouse requested that UNUM reconsider its decision. He commenced this lawsuit on February 9, 2004.

## II.    DISCUSSION

**A.    Motion to Strike**

UNUM moves to strike the deposition testimony of two UNUM employees, Thomas Waymire and Shaundra O'Neal, which Rouse submitted to the Court in support of his motion for

7

summary judgment and in opposition to UNUM's motion for summary judgment. Rouse offers this testimony in part to establish that UNUM's decision should be subjected to greater scrutiny as a result of a procedural irregularity. Generally, a district court may admit new evidence in an ERISA benefit denial case only if the proponent of the evidence establishes good cause to do so. *See Brown v. Seitz Foods, Inc., Disability Benefit Plan*, 140 F.3d 1198, 1200-01 (8th Cir. 1998) (explaining that additional evidence gathering is generally ruled out on deferential review and discouraged on de novo review). However, the Court may accept evidence outside the record for purposes of determining the proper standard of review. *See Barnhart v. UNUM Life Ins. Co. of Am.*, 179 F.3d 583, 589 (8th Cir. 1999) (suggesting that ERISA claimants may conduct discovery to uncover procedural irregularities). Accordingly, the Court denies UNUM's motion to strike and will consider Rouse's additional materials for the purpose of determining whether UNUM's decision to deny benefits was caused by a procedural irregularity.

Rouse also argues that the Court should consider this deposition testimony when analyzing the merits of UNUM's decision because the testimony is from UNUM's own representatives and merely discloses what materials it relied on when reaching its decision. As the Honorable Raymond L. Erickson, United States Magistrate Judge, concluded in his October 5, 2004, Order, a claimant may introduce pretrial discovery to demonstrate the scope and content of the administrative record. A claimant may also introduce pretrial discovery to demonstrate what materials the plan administrator considered when making its decision. *See Davidson v. Prudential Ins. Co. of Am.*, 953 F.2d 1093, 1095 (8th Cir. 1992); *see also Nagele v. Elec. Data Sys. Corp.*, 193 F.R.D. 94, 103 (W.D.N.Y. 2000); *Leonhardt v. Holden Bus. Forms Co.*, 828 F. Supp. 657, 667 (D. Minn. 1993). Accordingly, the Court declines to strike and will consider the Waymire and O'Neal deposition testimony for these purposes.

**B.	Cross-motions for summary judgment**

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party "bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, Rule 56(e) requires the party opposing the motion to respond by submitting evidentiary materials that designate "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

*1.	Standard of Review*

A participant in an ERISA plan may bring suit "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Typically, a court reviews a denial of benefits challenged under that section under a de novo standard of review. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). However, when a plan gives discretionary authority to the plan administrator or reviewing committee to determine eligibility for benefits or to construe the terms of the plan, a court reviews the decision to deny benefits for an abuse of discretion. *Id*. Here, the Plan provides that UNUM has "discretionary authority both

to determine [the employee's] eligibility for benefits and to construe the terms of the policy." Consequently, it appears the Court should review UNUM's decision for an abuse of discretion.

Rouse, however, urges the Court to apply a less deferential standard of review as set forth in *Woo v. Deluxe Corp.*, 144 F.3d 1157 (8th Cir. 1998). To obtain the less deferential standard of review of *Woo*, Rouse "must present material, probative evidence demonstrating that (1) a palpable conflict of interest or a serious procedural irregularity existed, which (2) caused a serious breach of the plan administrator's fiduciary duty to [him]." *Id.* at 1160. Once a conflict or procedural irregularity is found, the Court applies a "sliding scale" approach, taking into account the conflict or procedural irregularity while it applies an abuse of discretion standard of review. *Id.* at 1161.

Rouse claims that the only information UNUM and its employees gathered between the time UNUM initially granted him benefits and the time it decided to terminate his benefits was the Genex on-site job analysis report. Rouse argues that the Genex report reveals no new information that would support a decision to deny benefits. He maintains that UNUM's decision to terminate benefits therefore reflects a failure to use judgment and that he is entitled to review under the sliding scale approach. The Court disagrees.

"Procedural irregularities include denial of a claim without seeking an independent review, failure to properly investigate, or similar failure to use proper judgment." *See Fogerty v. Hartford Life and Accident Ins. Co.*, Civ. No. 02-655, 2003 WL 22076589, at *5 (D. Minn. Sept. 3, 2003). Rouse has not identified any such failure on UNUM's part. In this case, as in *Davidson v. Avon Prods., Inc.*, Civ. No. 00-2345, 2003 WL 1589524, at *3 (D. Minn. Mar. 26, 2003), there does not appear to be a failure to use judgment so much as a disagreement about

whether that judgment was correct. There being no serious procedural irregularity, the Court reviews UNUM's decision for abuse of discretion.

Under the abuse of discretion standard of review, a court must uphold the plan administrator's decision if it was "reasonable" or supported by "substantial evidence." *McGee v. Reliance Standard Life Ins. Co.*, 360 F.3d 921, 924 (8th Cir. 2004). Based only on the evidence that was before the plan administrator at the time the decision was made, a court focuses on whether "a reasonable person *could* have reached a similar decision, given the evidence before him, not that a reasonable person *would* have reached that decision." *Phillips-Foster v. UNUM Life Ins. Co. of Am.*, 302 F.3d 785, 794 (8th Cir. 2002).

2.  Merits

    a.  Material duties

UNUM first denied Rouse's claim because it determined that the material duties of his regular occupation, being managerial and supervisory in nature, did not require lifting in excess of his physical limitations and that Rouse was performing all of his management and supervisory duties. Rouse argues that this determination is unreasonable and not based on the evidence in the record. Specifically, he argues that it is clear from his self-reported duties, the initial Waymire report, and the Genex report that, taking into account the general character of his job at Duluth Paper, his material duties included loading and unloading delivery trucks, moving supplies throughout the warehouse, and demonstrating product and equipment (warehouse work). He argues that the warehouse work required him regularly to lift in excess of twenty pounds; UNUM's own reviewing physician opined that he may lift in excess of twenty pounds only occasionally.

UNUM relies heavily on a United States Department of Labor Dictionary of Occupational Titles (DOT) description of the material duties of Manager, Industrial Organization—the DOT job title UNUM argues is most analogous to President/CEO—in support of its decision to terminate Rouse's benefits. According to that description, lifting in excess of twenty pounds is not a material duty of a manager of an industrial organization in the national economy. UNUM argues that this amounts to substantial evidence supporting its conclusion that Rouse's material duties did not include lifting in excess of his physical limitations. The Court disagrees. Although UNUM now relies on the DOT description to support its decision to terminate benefits, UNUM itself implicitly rejected the DOT description as an inaccurate account of Rouse's material duties during the administrative review process. When Rouse initially applied for benefits, Waymire reviewed Rouse's description of his duties and the DOT description of Manager, Industrial Organization. He noted the discrepancies between the two accounts, but concluded that given the size of Rouse's company, Rouse's report that heavier lifting was a material duty of his job was not unreasonable. He wrote in his first vocational assessment:

> Based upon most companies a CEO/President would not function in the 30% category of Warehouse Supervisor and be involved in the heavier aspects of loading or unloading product. However, Mr. Rouse does indicate that in his business he does these duties and he considers these duties material to his work and they account for about 30% of his time per week. Given the size of his company this may not be unreasonable.

Based in part on Waymire's report, UNUM granted Rouse's application, thereby implicitly concluding that the DOT description is not substantial evidence supporting a denial of benefits. This conclusion is consistent with the fact that, although UNUM was aware of the DOT description when it terminated Rouse's benefits and upheld its decision on appeal, UNUM did not suggest in any communication to Rouse that it was a basis for its decision to terminate his

benefits. Accordingly, just as UNUM did during the administrative review proceedings, the Court concludes that the DOT description is not substantial evidence supporting termination of benefits.

In the alternative, UNUM argues that the Genex report is substantial evidence supporting its determination. Again, the Court disagrees. The Court has read the Genex report carefully; it does not contain any new information supporting the conclusion that heavy lifting was not a material duty of Rouse's occupation or warranting a reversal of UNUM's initial determination that Rouse was entitled to benefits. It appears that the report was based entirely on an in-office sit-down interview. It does not offer any conclusions or recommendations about what the material duties of Rouse's occupation were. In fact, most of the Genex report simply recounts Rouse's responses to interview questions wherein he reiterates that heavy lifting is a material duty of his occupation. The only statements in the report that arguably contradict Rouse's position that his material duties include heavy lifting are Page's comment that "it seems [Rouse] spends most of his time in his office," and her notation that, on the day she conducted her on-site interview of Rouse, he was wearing slacks, a button-up shirt, and a tie. The Court notes, however, that the Genex interview occurred post-injury—that is, while Rouse was physically unable to perform many of his reported warehouse duties. Furthermore, these statements are not inconsistent with Rouse's reports that, pre-injury, he spent approximately 30% of his time performing warehouse duties. This report, therefore, is not substantial evidence supporting UNUM's decision.

In sum, based on the record before UNUM, the only reasonable conclusion is that Rouse's material duties included warehouse work requiring heavy lifting. Because Rouse's and UNUM's doctors agree that Rouse's injury prevents him from loading and unloading trucks or

regularly lifting in excess of twenty pounds, there is no genuine dispute that Rouse is unable to perform at least one of the material duties of his job. UNUM therefore abused its discretion when it concluded that Rouse was performing all of the material duties of his occupation.

      b.      Loss of earnings attributable to disability

After soliciting financial information from Rouse and Duluth Paper, UNUM also concluded on appeal that Rouse did not qualify for benefits because he was not earning 20% less per month than his indexed pre-disability earnings as a result of his injury. Specifically, UNUM determined that Rouse's loss in earnings was due to Duluth Paper's loss of gross profit plus an increase in operating and miscellaneous expenses. It further determined, based on Mark Mathys' financial analysis, that increases in delivery charges accounted for only 7% of the company's decreased earnings.

Rouse argues that because UNUM advanced this position for the first time on appeal, it is an impermissible post-hoc rationale that the Court should disregard. Employee benefit plans governed by ERISA must

> (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and
>
> (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. § 1133. "The persistent core requirements of full and fair review include knowing what evidence the decision-maker relied upon, having an opportunity to address the accuracy and reliability of that evidence, and having the decision-maker consider the evidence presented by both parties prior to reaching and rendering his decision." *Abram v. Cargill, Inc.*, 395 F.3d 882,

886 (8th Cir. 2005) (citations and quotations omitted). In other words, the plan administrator must give the plan beneficiary an opportunity to have a "meaningful dialogue" with the plan administrator about the administrator's benefits determination. *See id.*

The process used by UNUM was not consistent with a full and fair review. In this case, as in *Abram*, the evidence upon which UNUM relies to support its conclusion that Rouse's reported disability was not causing an earnings loss of at least twenty percent—Mark Mathys' financial analysis—was presented to Rouse for the first time as an enclosure to UNUM's letter affirming its decision to terminate benefits. As a result, Rouse was not provided an opportunity to challenge the accuracy of the report until after UNUM issued its final decision. "There can hardly be a meaningful dialogue between the claimant and the Plan administrators if evidence is revealed only after a final decision. A claimant is caught off guard when new information used by the appeals committee emerges only with the final denial." *Id.* Rouse should have been permitted to review and respond to Mathys' financial analysis. Under these circumstances, the Court concludes that the most appropriate course of action is to deny the parties' motions for summary judgment and remand the case to UNUM with instructions to reopen the administrative record to permit Rouse to respond to Mathys' financial analysis. *See id.* at 888. In the meantime, the Court stays this litigation pending UNUM's consideration of Rouse's response. *Cf. Moline Machinery, Ltd. v. Pillsbury Co.*, Civ. No. 00-2353, 2001 WL 1766339 (D. Minn. Dec. 21, 2001) (noting that courts hold an inherent power to stay proceedings to control the docket, conserve judicial resources, and provide for the just determination of cases pending review; staying ERISA action while plaintiff exhausted administrative remedies).

### III.  CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. UNUM's Motion for Summary Judgment [Docket No. 18] is DENIED.

2. UNUM's Motion to Strike [Docket No. 35] is DENIED.

3. Rouse's Motion for Summary Judgment [Docket No. 24] is DENIED.

4. The case is remanded to UNUM. On remand, UNUM shall reopen the administrative record to permit Rouse to respond to Mathys' financial analysis.

5. This litigation is stayed pending remand.

6. The Clerk shall administratively terminate this action in his records, without prejudice to the right of any party to move to reopen the proceedings for good cause shown, for the entry of any stipulation or order, or for any other purpose required to obtain a final determination of the litigation.

Dated:  August 18, 2005

                                              s/ Joan N. Ericksen_____
                                              JOAN N. ERICKSEN
                                              United States District Judge